**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **LORI HUNT**<br>**272 HEMLOCK RAVINE DRIVE**<br>**BLACKLICK, OHIO 43004,**<br><br>      **Plaintiff,**<br><br>      v.<br><br>**AT&T INC.**<br>**C/O CT CORPORATION SYSTEM**<br>**4400 EASTON COMMONS WAY,**<br>**SUITE 125**<br>**COLUMBUS, OHIO 43219,**<br><br>**AT&T TELEHOLDINGS, INC.**<br>**D/B/A AT&T MIDWEST**<br>**C/O CT CORPORATION SYSTEM**<br>**4400 EASTON COMMONS WAY**<br>**SUITE 125**<br>**COLUMBUS, OHIO 43219,**<br><br>**OHIO BELL TELEPHONE COMPANY**<br>**D/B/A AT&T OHIO**<br>**C/O CT CORPORATION SYSTEM**<br>**4400 EASTON COMMONS WAY**<br>**SUITE 125**<br>**COLUMBUS, OHIO 43219,**<br><br>      **Defendants.** | **Case No.**<br><br>**Judge**<br><br>**Jury Demand Endorsed Herein** |

**COMPLAINT**

Plaintiff Lori Hunt ("Hunt"), by and through undersigned counsel, for her Complaint against Defendants AT&T Inc., AT&T Teleholdings, Inc. (d/b/a AT&T Midwest), and Ohio Bell Telephone Company (d/b/a AT&T Ohio), alleges as follows:

## INTRODUCTION

1. This lawsuit centers on the wrongful, discriminatory termination of Plaintiff Lori Hunt's employment by Defendants AT&T Inc., Ohio Bell Telephone Company ("AT&T Ohio"), and AT&T Teleholdings, Inc. ("AT&T Midwest") (collectively, "AT&T" or "Defendants").

2. Hunt is a black female and former employee of AT&T who worked in the white male dominated Construction and Engineering Department at AT&T Ohio (the "Construction Department"). More specifically, Hunt worked as a Manager of Outside Plant Engineering, serving as the Chief of Staff to the Ohio Director of Construction Engineering, Stacey Fowler, who is also a black female. On April 18, 2023, AT&T terminated Fowler; the next day, Fowler filed a charge of discrimination with the Ohio Civil Rights Commission.

3. After AT&T terminated Fowler, she asked Hunt to send her a copy of AT&T's Code of Business Conduct—a document publicly available online on its own website at https://cobc.att.com/mission—because Fowler was told a primary reason for her termination was for "not following" that Code. In response to Fowler's request, Hunt printed a copy of the Code and later gave that copy to Fowler.

4. On or around June 8, 2023, AT&T's "Asset Protection" team placed an in-person invitation on Hunt's AT&T-employee electronic calendar. Investigator Louis Williams conducted the meeting, with at least one other AT&T employee observing the meeting over Zoom. At the meeting, Investigator Williams notified Hunt that AT&T had opened an investigation into her employment due to an anonymous tip that alleged Hunt had given AT&T's "proprietary information" to Fowler. Investigator Williams explained to Hunt that "proprietary" means non-public information containing contractor or customer data.

5. In the meeting, Hunt explained that she had not provided any "proprietary information" to Fowler. In the spirit of transparency, Hunt told Investigator Williams that she

had only given Fowler a copy of AT&T's Code of Business Conduct, which AT&T makes available to the public online.

6. During that same meeting, Hunt reported to Investigator Williams that Area Managers—all of whom are white males—had in fact given non-public information concerning a recent reduction in force to former AT&T employees who were affected by that reduction in force, all of whom are also white males. Hunt further reported that, unlike AT&T's Code of Conduct that Hunt was being investigated for, the information that the white male managers shared contained confidential information related to the reduction in force.

7. Hunt also shared with Investigator Williams that Area Manager Randy Kozelka was conferring with Fowler regarding aspects of the reduction in force and seemingly assisting Fowler after her termination by providing sensitive information to Fowler.

8. Two weeks later, on June 22, 2023, AT&T terminated Hunt for giving AT&T's "proprietary information" to Fowler, and replaced her with a white male.

9. Thus, based on an "anonymous tip," AT&T investigated and terminated Hunt for providing AT&T's publicly available Code of Business Conduct to her former boss, and then replaced Hunt with a white male. Yet AT&T neither investigated, nor terminated, the white male managers who provided confidential, proprietary information to former AT&T employees nor the AT&T Area Manager who was providing information to Fowler.

10. Hunt was a target in AT&T's campaign against black women in the Construction Department, and was fired because she is a black woman.

11. Accordingly, Hunt now brings this civil action, to hold AT&T accountable for its discriminatory actions, and to recover damages for the discrimination she has endured.

## PARTIES

12. Plaintiff Lori Hunt, is an Ohio resident. From February 8, 2021, to June 22, 2023, Hunt was an employee of AT&T Ohio.

13. Defendant AT&T Inc. is a Dallas, Texas-based communications holding company with its principal place of business at 208 S. Akard Street, Dallas, Texas 75202. At all relevant times, AT&T, Inc. owned AT&T Ohio.

14. Defendant AT&T Midwest is a Delaware communications company with its principal place of business at 30 South Wacker Drive, Floor 34, Chicago, IL 60606. Upon information and belief, at all relevant times, AT&T Midwest had an ownership interest in AT&T Ohio.

15. Defendant AT&T Ohio is a Cleveland, Ohio-based telecommunications company with its principal place of business at 750 Huron Road, Cleveland, Ohio 44113. At all relevant times, Defendant AT&T Ohio employed Plaintiff Hunt in Ohio.

## JURISDICTION AND VENUE

16. This Court has jurisdiction over Plaintiff Hunt's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has supplemental jurisdiction over Plaintiff Hunt's state law claims pursuant to 28 U.S.C. § 1367.

17. Venue is proper under 28 U.S.C. § 1391 because substantially all the conduct complained of occurred within this District.

## ADMINISTRATIVE PROCEDURES

18. Within 300 days of the conduct alleged below, and prior to the filing of this Complaint, Hunt filed a charge of discrimination with the Ohio Civil Rights Commission (the "OCRC") against AT&T.

4

19. The OCRC issued Hunt a Notice of Right to Sue letter on October 26, 2023, which is attached as Exhibit A.

20. Hunt has filed this Complaint within 90 days of the issuance of the Notice of Right to Sue letter.

21. Hunt has properly exhausted her administrative remedies prior to the filing of this suit.

## FACTUAL BACKGROUND

**A.  Hunt's Exemplary Employment History With AT&T.**

22. Hunt is a black female and former employee of AT&T Ohio.

23. Hunt was employed by AT&T Ohio from February 8, 2021, to June 22, 2023.

24. Throughout her employment at AT&T, Hunt worked in the Construction Department.

25. The Construction Department predominantly consists of white males.

26. From February 8, 2021, to April 18, 2023, Hunt reported to the Ohio Director of Access-Construction and Engineering, Stacey Fowler, who is a black female.

27. From April 19, 2023, to June 22, 2023, Hunt reported to the Michigan Director of Access-Construction and Engineering, Jim Styf, who assumed the roles and responsibilities of Ohio Director on April 19, 2023, the day after AT&T fired Fowler. Styf is a white male.

28. Throughout Hunt's employment at AT&T, Hunt received glowing reviews. Hunt's consistently positive reviews led to AT&T awarding Hunt substantial performance bonuses.

5

**B.    During Hunt's Employment at AT&T, Hunt Experiences Racism and Sexism Within AT&T Ohio's Construction Department, Which is Predominately White Male.**

29.    As noted above, the Construction Department predominantly consists of white males.

30.    Racism and sexism in the Construction Department was pervasive during Hunt's tenure.

31.    Indeed, throughout the course of her employment, Hunt witnessed overt racism and sexism by white male AT&T employees against female minorities.

32.    From 2021 to April 18, 2023, the racism and sexism that Hunt experienced within the Construction Department was often related to white male employees who were disgruntled that they were reporting to a black female in Fowler.

33.    For example, Hunt overheard one white, male AT&T manager complain to at least one other white, male AT&T manager about reporting to Fowler, a black female, and saying: "We had to take eight years of Obama, and now we have to deal with 'that bitch'?"

34.    Hunt later learned that the white, male employees at AT&T resented the fact that Fowler hired minorities, and in particular black women—like Hunt—into jobs within the Construction Department.

35.    For no reason other than that Hunt is a black female, the white male AT&T employees within the Construction Department associated Hunt with Fowler.

36.    Because of the racism within the Construction Department, Hunt believed that she had to conceal any ties Hunt had with other black employees.

37.    The racism and sexism within the Construction Department increased in early 2023 following a reduction-in-force ordered by AT&T.  Many of the managers selected for the reduction in force were white males.

6

38. Upon information and belief, following the reduction-in-force, at least one of the Area Managers falsely told some of the terminated managers that Fowler made the reduction-in-force decisions and further falsely represented that Fowler had chosen to terminate them because they were white men.

39. Upon information and belief, following the reduction-in-force, the same Area Managers (all of whom were white males) gave some of the terminated managers confidential managerial documents, against Fowler's direct orders and in violation of AT&T policy.

40. Upon information and belief, no Area Managers have been investigated or disciplined for disclosing confidential materials in violation of management orders and AT&T policy.

41. Shortly after the reduction-in-force took place, Fowler found a racist, sexist death threat in her office (the "Death Threat").

42. The Death Threat stated in all capital letters: "YOU STUPID **NIGGER** BITCH. IF WE CAN'T TAKE YOU **DOWN** WILL [sic] TAKE YOU **OUT**." Fowler's business card with her title, "AT&T Director" crossed out, was stapled to the Death Threat.

43. Fowler reported the Death Threat to AT&T the same day she found it, and AT&T immediately instructed Fowler to work from home while AT&T investigated the Death Threat.

44. AT&T did not notify Hunt, a black female, of the Death Threat, nor did AT&T instruct Hunt to work from home while AT&T investigated the Death Threat.

45. About two weeks after Fowler found and reported the Death Threat, on April 18, 2023, AT&T terminated Fowler—the highest-ranking woman of color in the Construction Department—for purportedly violating AT&T's policies and Code of Business Conduct. AT&T did not identify what policies or provision of the Code of Business Conduct Fowler supposedly

violated, and AT&T did not provide a copy of any company policy or Code of Business Conduct to Fowler.

### C. After AT&T Terminated the Highest-Ranking Woman of Color in the Construction Department, AT&T's White Male Employees Warned Hunt that Her Job Might Now Be in Danger.

46. On or about April 18, 2023, the same day AT&T fired Fowler, Assistant Vice President Eric Cole, who supervised and ultimately terminated Fowler, told Hunt to talk to the Construction Department's Area Managers to "see what they want [Hunt] to do."

47. Before Hunt ever spoke to the Area Managers, AT&T determined that Styf, a white male and AT&T Director for Michigan, would assume Fowler's job and responsibilities in Ohio.

48. On or about April 19, 2023, Styf told Hunt that she would be his Chief of Staff and that Hunt would report directly to him.

49. Because Styf decided that Hunt would remain in her position as Chief of Staff but would also begin reporting to Styf as Director of Ohio and Michigan, Styf instructed Chris Richardson, Styf's then-Chief of Staff, to train Hunt.

50. When Richardson trained Hunt, Richardson made several comments to Hunt that confirmed the pervasive racism against black women within the Construction Department that had led to Fowler's ousting.

51. For example, Richardson told Hunt that AT&T terminated Fowler because the Area Managers in the Department believed Fowler had created a "bubble" of black employees who protected Fowler and made her "untouchable"—which those same Area Managers resented.

52. Moreover, Richardson told Hunt that the Department's Area Managers believed Hunt was one of the black employees who Fowler had placed in AT&T to protect her.

8

53. In fact, Richardson represented to Hunt that the Area Managers perceived Hunt as a "buffer" and a "minion" for Fowler.

54. In addition to Richardson's comments, several white male employees in the Construction Department warned Hunt that her job was still at risk solely because Fowler was no longer employed at AT&T.

55. For example, white male AT&T employees would passively suggest to Hunt that her job was in danger, asking Hunt, "With [Fowler] gone, what are you going to do?"

56. Over time and based on conversations with Area Managers and others, Hunt came to believe that she had a target on her back because she was a black female that many in the Construction Department associated with Fowler.

### D. Hunt Provides AT&T's Public Code of Business Conduct to Fowler, and AT&T Opens an Investigation into Hunt for Sharing "Proprietary Information" Based on an "Anonymous Tip."

57. On April 18, 2023, AT&T terminated Fowler for purportedly violating the Code of Business Conduct.

58. On April 19, 2023, Fowler filed a charge of discrimination with the Ohio Civil Rights Commission against AT&T.

59. Upon information and belief, AT&T opened an investigation into Fowler's charge of discrimination in or around late-April 2023.

60. In or around May 2023, Fowler contacted Hunt and requested that Hunt send AT&T's Code of Business Conduct to Fowler, because although AT&T terminated Fowler for purportedly violating the Code of Business Conduct, AT&T never provided a copy of that Code to Fowler.

9

61. In response to Fowler's request, Hunt provided a copy of AT&T's Code of Business Conduct to Fowler.

62. AT&T's Code of Business Conduct is publicly available.

63. Indeed, AT&T has created an entire website domain specifically for its Code of Business Conduct: cobc.att.com

64. Thus, AT&T posts its Code of Business Conduct—as well as more than 20 translations of the same Code—on a publicly available website.

65. In or around May 2023, AT&T placed an appointment on Hunt's electronic calendar.

66. Hunt accepted that appointment.

67. On or around June 8, 2023, Hunt met with AT&T Investigator Louis Williams at AT&T's Broad Street office building in Columbus. Another AT&T employee remotely observed the interview over Zoom.

68. Hunt believed that she was meeting with Williams as part of the investigation into the Death Threat that Fowler received months earlier.

69. So, when the first question that Williams asked Hunt was, "Do you know why you're here?" Hunt immediately answered, "Stacey Fowler?" Williams then responded, "Let's talk about that."

70. To Hunt's surprise, Williams did not meet with Hunt to investigate the Death Threat.

71. Instead, Williams told Hunt that, based on an "anonymous tip," Hunt was under investigation for providing "proprietary information" to Fowler.

10

72. At one point during the investigatory interview, Hunt asked Williams to define "proprietary information." Williams stated that "proprietary information" is "anything with client information."

73. Hunt explained to Williams that she had never provided any "proprietary information" to any non-AT&T employee or entity, including Fowler.

74. In the spirit of transparency, Hunt told Williams that she had provided AT&T's Code of Business Conduct to Fowler, and further explained that the Code is publicly available, and therefore is not "proprietary information."

75. During the meeting with Williams, Hunt reported to Williams that white male AT&T employees had shared information with former employees and that AT&T never investigated them.

76. More specifically, Hunt told Williams that Area Managers, including Kozelka, had shared confidential internal information with former employees—none of whom were investigated by AT&T.

77. Hunt also told Williams that Kozelka was conferring with Fowler and sharing sensitive information with Fowler after her termination.

78. Upon information and belief, even before the June 8th investigation, AT&T was aware that at least one Area Manager shared confidential management documents related to the reduction-in-force with at least one former manager who was selected for the reduction-in-force, which violated their supervisor's orders and AT&T policy.

79. Upon information and belief, AT&T did not investigate Kozelka or any other Area Manager—all of whom are white—regarding whether they shared any confidential and/or

11

proprietary information with non-AT&T employees, including former AT&T employees and Fowler.

80. At the conclusion of the Zoom conference, Williams walked with Hunt back to her desk.

81. While they walked, Williams told Hunt that he did not believe she had anything to worry about.

82. Hunt pointed to her arm to highlight her skin color, and said, "I'm fine? I don't think I'm fine," implying to Williams that Hunt was being targeted by AT&T for her race.

83. On or around June 9, 2023, Hunt called Styf to notify him of the investigation and her concerns.

84. Styf assured Hunt that there was nothing to worry about and that Hunt had not done anything wrong.

**E.     On June 22, 2023, AT&T Terminates Hunt.**

85. On or around June 18, 2023, less than two weeks after Hunt met with Investigator Williams and answered his questions, Styf emailed Hunt requesting an in-person meeting on June 22nd.

86. Hunt agreed to the meeting.

87. On June 22, 2023, Hunt met with Director Styf, who terminated Hunt for providing "proprietary information" to Fowler.

88. AT&T's Code of Business Conduct is not "proprietary information"

89. The alleged reason for Hunt's termination was not legitimate and was clearly pretextual.

90. Upon information and belief, AT&T assigned Hunt's job and responsibilities to Chris Richardson—a white male who is Chief of Staff to AT&T Director of Michigan Styf.

91. Thus, Hunt's job and responsibilities have been assumed by a white male.

## COUNT I
## Race Discrimination—42 U.S.C. § 1981
## As Against AT&T

92. Hunt hereby restates, realleges, and incorporates by reference each of the above allegations, as if fully restated here.

93. Hunt suffered an adverse employment action when AT&T terminated Hunt.

94. AT&T terminated Hunt because of her race.

95. But for Hunt's race, AT&T would not have terminated her employment.

96. AT&T violated 42 U.S.C. § 1981 by subjecting Hunt to discrimination by terminating Hunt's employment and assigning her duties to Chris Richardson, a white male, and/or other non-black individuals.

97. As a direct and proximate result of AT&T's unlawful discriminatory conduct in violation of § 1981, Hunt has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits for which she is entitled to an award of monetary damages, and other relief.

98. As a direct and proximate result of AT&T's unlawful discriminatory conduct in violation of § 1981, Hunt has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem, fear for her safety, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

99. AT&T's unlawful discriminatory conduct constitutes a willful and wanton violation of § 1981, which was outrageous, malicious, was intended to injure Hunt, and was done with conscious disregard of Hunt's civil rights, entitling Hunt to an award of punitive damages.

## COUNT II
**Race Discrimination—Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e,** *et seq*.
**As Against AT&T**

100. Hunt hereby restates, realleges, and incorporates by reference each of the above allegations, as if fully restated here.

101. Hunt suffered an adverse employment action when AT&T terminated Hunt.

102. AT&T terminated Hunt because of her race.

103. Alternatively, Hunt's race was a motivating factor in AT&T's decision to terminate Hunt.

104. AT&T violated Title VII by subjecting Hunt to discrimination by deciding to terminate Hunt's employment and assigning her duties to Chris Richardson, a white male, and/or other non-black individuals.

105. As a direct and proximate result of AT&T's unlawful discriminatory conduct in violation of Title VII, Hunt has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits for which she is entitled to an award of monetary damages, and other relief.

106. As a direct and proximate result of AT&T's unlawful discriminatory conduct in violation of Title VII, Hunt has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem, fear for her safety, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

107. AT&T's unlawful discriminatory conduct constitutes a willful and wanton violation of Title VII, which was outrageous, malicious, was intended to injure Hunt, and was

done with conscious disregard of Hunt's civil rights, entitling Hunt to an award of punitive damages.

## COUNT III
### Race Discrimination—R.C. 4112.02
### As Against AT&T

108. Hunt hereby restates, realleges, and incorporates by reference each of the above allegations, as if fully restated here.

109. Hunt suffered an adverse employment action when AT&T terminated Hunt.

110. AT&T terminated Hunt because of her race.

111. Alternatively, Hunt's race was a motivating factor in AT&T's decision to terminate Hunt.

112. AT&T violated R.C. 4112.02 by subjecting Hunt to discrimination by deciding to terminate Hunt's employment and assigning her duties to Chris Richardson, a white male, and/or other non-black individuals.

113. As a direct and proximate result of AT&T's unlawful discriminatory conduct in violation of R.C. 4112.02, Hunt has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits for which she is entitled to an award of monetary damages, and other relief.

114. As a direct and proximate result of AT&T's unlawful discriminatory conduct in violation of R.C. 4112.02, Hunt has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem, fear for her safety, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

115. AT&T's unlawful discriminatory conduct constitutes a willful and wanton violation of R.C. 4112.02, which was outrageous, malicious, was intended to injure Hunt, and

15

was done with conscious disregard of Hunt's civil rights, entitling Hunt to an award of punitive damages.

## COUNT IV
**Sex Discrimination—Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e,** *et seq.*
**As Against AT&T**

116. Hunt hereby restates, realleges, and incorporates by reference each of the above allegations, as if fully restated here.

117. Hunt suffered an adverse employment action when AT&T terminated Hunt.

118. AT&T terminated Hunt because of her sex.

119. Alternatively, Hunt's sex was a motivating factor in AT&T's decision to terminate Hunt.

120. AT&T violated Title VII by subjecting Hunt to discrimination by deciding to terminate Hunt's employment and assigning her duties to Chris Richardson, a white male, and/or other males.

121. As a direct and proximate result of AT&T's unlawful discriminatory conduct in violation of Title VII, Hunt has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits for which she is entitled to an award of monetary damages, and other relief.

122. As a direct and proximate result of AT&T's unlawful discriminatory conduct in violation of Title VII, Hunt has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem, fear for her safety, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

123. AT&T's unlawful discriminatory conduct constitutes a willful and wanton violation of Title VII, which was outrageous, malicious, was intended to injure Hunt, and was done with conscious disregard of Hunt's civil rights, entitling Hunt to an award of punitive damages.

### COUNT V
### Sex Discrimination—R.C. 4112.02
### As Against AT&T

124. Hunt hereby restates, realleges, and incorporates by reference each of the above allegations, as if fully restated here.

125. Hunt suffered an adverse employment action when AT&T terminated Hunt.

126. AT&T terminated Hunt because of her sex.

127. Alternatively, Hunt's sex was a motivating factor in AT&T's decision to terminate Hunt.

128. AT&T violated R.C. 4112.02 by subjecting Hunt to discrimination by deciding to terminate Hunt's employment and assigning her duties to Chris Richardson, a white male, and/or other males.

129. As a direct and proximate result of AT&T's unlawful discriminatory conduct in violation of R.C. 4112.02, Hunt has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits for which she is entitled to an award of monetary damages, and other relief.

130. As a direct and proximate result of AT&T's unlawful discriminatory conduct in violation of R.C. 4112.02, Hunt has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem, fear for her safety, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

131. AT&T's unlawful discriminatory conduct constitutes a willful and wanton violation of R.C. 4112.02, which was outrageous, malicious, was intended to injure Hunt, and was done with conscious disregard of Hunt's civil rights, entitling Hunt to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Lori Hunt respectfully requests judgment in her favor on all claims in the Complaint against all Defendants jointly and severally, and prays for the following relief:

A. Economic compensatory damages in an amount to be determined at trial;

B. Non-economic compensatory damages in an amount to be determined at trial;

C. Liquidated, treble, punitive, or other exemplary damages in an amount to be determined at trial;

D. Front pay and back pay in an amount to be determined at trial;

E. Attorneys' fees, expert fees, costs, and expenses incurred in pursuing the claims against Defendants pursuant to 42 U.S.C. § 1988 and state law;

F. Pre-judgment and post-judgment interest; and

G. All other legal and equitable relief this Court and/or a jury determines to be appropriate.

Date: __December 6, 2023	Respectfully submitted,

 /s/ Shawn J. Organ\
Shawn J. Organ, Esq. (0042052)\
Kirsten R. Fraser, Esq. (0093951)\
Connor A. Organ, Esq. (0097995)\
**Organ Law LLP**\
1330 Dublin Road\
Columbus, Ohio  43215\
614.481.0900\
614.481.0904 (f)\
sjorgan@organlegal.com\
kfraser@organlegal.com\
corgan@organlegal.com

*Attorneys for Plaintiff Lori Hunt*

## JURY DEMAND

Plaintiff Lori Hunt hereby demands a trial by jury of all issues triable of right by jury.

/s/ Shawn J. Organ
Shawn J. Organ, Esq. (0042052)